

FISCHETTI
& MALGIERI LLP
Attorneys at Law

747 Third Avenue, 20ᵗʰ Floor
New York, NY 10017
212-593-7100 Tel
212-758-2809 Fax
*www.fischettilaw.com*

*Ronald P. Fischetti*
*Phyllis A. Malgieri*

September 11, 2012

Honorable Katherine B. Forrest
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:    *U.S. v. John Fazio Jr., 11 Cr. 873 (KBF)*

Dear Judge Forrest:

We respectfully submit this letter in response to the Government's Sentencing Memorandum dated September 6, 2012. For the reasons set forth below, we submit that (1) Mr. Fazio cannot be found to have joined the conspiracy in May 2004; (2) Mr. Fazio is responsible for less than $2.5 million loss warranting only a 16 level enhancement under U.S.S.G. §2B1.1(b)(I); (3) there was no credible evidence of violence in this case; (4) Mr. Fazio should not receive any criminal history points for his two prior convictions; (5) Mr. Fazio should not be blamed for the failure of the Probation Department to receive his financial information; and (6) Mr. Fazio's decisions concerning how to approach his medical treatment with the Bureau of Prisons is not evidence of dishonesty.

I.    **MEMBERSHIP IN THE CONSPIRACY**

Insofar as Mr. Fazio's membership in the conspiracy is concerned, the government has finally acknowledged that Mr. Fazio cannot be held responsible for loss amounts that were incurred prior to joining the conspiracy. Having resolved that issue, we now address the evidence, and lack thereof, with regard to when John Fazio Jr. joined the conspiracy.

Lacking in sufficient facts to support its argument, the government states that the Court may infer that Fazio's participation in the criminal conspiracy commenced at the "**earliest date** when he first became an employee of Local 348 or the Health and Welfare Benefits Fund." Gov't Resp. at 3 (emphasis supplied). However, we have never conceded, nor do we agree, that Fazio's *employment* with Local 348 triggered his immediate participation in the criminal conspiracy. Rather, our position was only that, assuming he joined in 1999, the date which the original Probation Report stated he

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 2

became a member of the union, the loss amount would be less then $2.5 million. We did not address the argument as to when, precisely, he joined the conspiracy because we did not need to given the 1999 date.[1] Now that the government represents to the Court that Mr. Fazio joined in May, 1994, we herein address this speculative and unreasonable conclusion.

First, the government provides no evidence as to when Mr. Fazio is alleged to have joined the conspiracy. Merely relying on the date Mr. Fazio became an employee paints with too broad a brush the scope of the conspiratorial objectives to which he agreed. The Court cannot and should not simply assume that as soon as he commenced working for Local 348, in 1994, that Fazio instantly entered into a criminal conspiracy. The government must prove when he joined by a preponderance of the evidence, which it has thus far failed to do so, not just argue that his criminal conduct commenced as soon as he became employed by the union.

Second, Mr. Fazio was only 22 years old in 1994 when the government alleges he joined his uncle and cousin in the conspiracy. He began his employment merely as a clerk, answering phones and completing data entry tasks. Indeed, it surely strains credulity to believe that a young man would either be welcomed into, or agree to join a criminal conspiracy by calling employers and extorting money from them **his first day on the job or soon thereafter.** Even being privy to the conspiracy or having knowledge of the conspiracy does not equate joining. Joining a conspiracy requires much more.

## II.    LOSS

In our sentencing submission filed on August 30, 2012 we challenged two issues. First, we challenged amounts that preceded 1999, the date the Probation Report represented Mr. Fazio joined the union. Second, we objected to the government's representation of John Maloney's loss calculation and recalculated same using the 1999 rubric. Assuming John Fazio joined the union in 1994, we herein address the loss calculation as it relates to John Maloney and Steven Quadrino.

---

[1] Our original calculation assumed 1999 for the sake of argument because the Presentencing Report stated that Mr. Fazio became a member of the union in 1999. We did not receive the addendum to the Probation Report until only hours before the government submitted their response on September 6, 2012.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 3

**a. John Maloney**

The government's calculation regarding Maloney is inaccurate and unsupported by the evidence. **First,** the government attempts to back into a loss amount which exceeds $2.5 million based on sheer speculation. The government's table at pages 12–13 of their submission reflects "how the monthly kickbacks **might have gradually** increased from a few thousand dollars per month in 1993, to approximately $5,000 by year 2000, to approximately $7,000/month by late 2004." (emphasis supplied). **Second,** the government fails to acknowledge Maloney's testimony that the checks were used to cover for "**money that wasn't paid** and partly for work that was still being done" (Tr. 865–866) and thus, while unclear when exactly the cash payments ceased, surely it was prior to the invoicing that commenced on October 11, 2004.

The government's carefully chosen words evidence the speculative nature of their approach. Far from representing to the Court what Maloney's actual testimony was, the government attempts to justify its overestimation of the loss amount using a graduated system of payment that is contradicted by the testimony and 302 report.

Maloney's testimony was that the cash payments were about $1,500 to $2,000/month which later changed to $4,000 or $5,000/month. *Tr. at 770–771.* While the government chose not to elicit trial testimony from Maloney when the payments increased from $2,000 to $4,000 or $5,000, the 302 report prepared by the government supplies this very information which the government ignores. The 302 report states that "**Maloney recalled the higher monthly payments,**" those in the amount of $4,000 or $5,000, "**began in approximately 2000.**" FBI 302 Report at 3.[2] There was no testimony or statement in the 302 that the payments increased gradually – indeed the evidence is that the payments were between $1,500–$2,000[3] until approximately 2000 and then increased to $4,000 or $5,000/month. Thus, the references in the government's table calculating payments for the years 1995-1999 at approximately $4,500/month is belied by the evidence.

Nor are the payments of $5,500/month from 2000–2003, or the payments of $6,500/month from January 2004 — September 2004 supported by Maloney's testimony. The government's attempt to inject an amount over $5,000 is beyond disingenuous and is

---

[2] The 302 report was included in our original submission filed August 30, 2012 and is again annexed hereto at Exhibit "A." For the Court's convenience, we have highlighted the relevant portions of the 302 report.
[3] Although Maloney testified at trial that the amount was between $1,500–$2,000, in our calculation we rely on the $2,000 amount for the payments from May 1994–1999 because Mr. Maloney's 302 Report annexed hereto at Exhibit "A" contains that amount at page 3.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 4

completely and utterly inappropriate. First, the record is devoid of any testimony that the cash payments ever exceeded $5,000/month. Furthermore the following testimony, elicited by AUSA Kwok from Maloney shatters the government's position:

> AUSA Kwok:        "What did it change to, what is the **maximum**?"
>
> Maloney:          "**Maybe four, 5,000**."

Tr. 771 *(emphasis supplied)*.

That the amounts of the checks exceeded $5,000 does not justify the government's artificially created trajectory of payments beyond $5,000. After all, the testimony was clear that the maximum of the cash payments was $4,000 or $5,000. Thereafter, as a result of Maloney's arrears, the payment plan was modified to allow for checks which were, in part to make up for the arrears, and to also account for work that remained to be performed by Maloney (Maloney acknowledged that he had fell behind in his payments: "It was partly for money that wasn't paid and partly for work that was still being done because they were leaving us" *Tr. at 865-866*). As such, the checks, which resulted from the invoices which began being generated on October 11, 2004[4] are **not** evidence that the cash payments exceeded $5,000/month. Rather, as already explained, the amounts of the checks exceeded $5,000 to account for the outstanding payments by Maloney. Thus, the government's contrary argument is meritless.

Accordingly, the below calculations reveal that the loss amount is still well below the $2.5 million threshold.

Thus, granting the government's position that Mr. Fazio is responsible for payments by Maloney beginning in May 1994, though not agreeing to it, the correct calculation is as follows:

| | | |
|---|---|---|
| May 1994–December 1994: | 8 months x $2,000 | = $16,000 |
| 1995–1999: | 60 months x $2,000 | = $120,000 |
| 2000–September 2004: | 57 months x $5,000 | = $285,000 |
| October 2004–March 2005 (invoices) | | = $43,450 |
| | **TOTAL:** | **=$464,450** |

---

[4] A copy of the invoices and checks were annexed at Exhibit "K" to our first submission filed August 30, 2012.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 5

Indeed, these calculations give the government the benefit of the doubt on multiple occasions: (1) using the $2,000 figure and not the $1,500 figure for the payments made in the 1990's; (2) using the $5,000 figure and not $4,000 for the years 2000–2004 and (3) allowing for cash payments until September 2004, when the testimony makes clear that the check payments included arrears that obviously predated the October 2004 invoicing and checks.

### b. Steven Quadrino

Additionally, upon further review of the government's loss calculation, counsel noticed yet another misrepresentation of the trial testimony.[5] The government represents in Document 149-1 that Steven Quadrino made ERISA kickbacks in the amount of $10,000 per year (Tr. 1579), from the "end of 2002" (Tr. 1577) until "early 2010" (Tr. 1582). The government thereby calculates the total ERISA kickback as $90,000 ($10,000 x 9 years).

However, Mr. Quadrino's trial testimony reveals that he did not agree to pay the $10,000 ERISA kickbacks until 2007, not 2002. The government elicited the following testimony:

| AUSA Blais: | Did you participate in the negotiation of the **2007 collective bargaining agreement**? |
|---|---|
| Quadrino: | Yes, I did. |
| AUSA Blais: | With whom from Local 348 did you negotiate that collective bargaining agreement? |
| Quadrino: | With John Fazio. |
| AUSA Blais: | What if anything did John Fazio say to you in connection with **this negotiation** about Printcraft's participation in Local 348's health and welfare fund? |

---

[5] Although we did not challenge the loss amount with regard to Mr. Quadrino in our original submission because our argument was focused on losses excludable by virtue of preceding 1999, we do so now and submit that Mr. Quadrino's loss calculation must be adjusted to appropriately reflect his testimony.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 6

|              |                                                    |
| ------------ | -------------------------------------------------- |
| Quadrino:    | We had discussed that the occurrences on the medical insurance claims were high and that we needed to -- **he had asked me to pay a $10,000 fee to keep the medical insurance costs to the company down**. |

Tr. 1579 (*emphasis supplied*).

Although Mr. Quadrino explains that there was a previous contract in place between 2002 to 2007, there was no testimony by Quadrino that he made any such payments between 2002 and 2007. Rather, the testimony reveals that payments began in 2007 to keep the costs of medical insurance down. Indeed, in that same direct examination, Mr. Quadrino testified that he began making the payments with the understanding that doing so would "keep the cost of medical insurance down." Tr. 1580. In response the government then asked, "How did the terms of the healthcare coverage provided by Local 348 change, if at all, during the time of the second collective bargaining agreement?" to which Mr. Quadrino stated, "[t]**hey started off very good**…" *Id*. As such, Quadrino's testimony contradicts the government's representation to the Court that such payments began in 2002.

Quadrino's testimony clearly conveys nothing more than the fact that payments began in 2007. Therefore, the government's calculation of $90,000 ($10,000 x 9 years) for ERISA kickbacks is erroneous. The calculation should be adjusted to reflect that Quadrino's testimony was that only four payments were made (2007, 2008, 2009, and 2010) thus rendering a total of $40,000 ($10,000 x 4 years) in ERISA kickbacks and thereby causing a further reduction of $50,000 from Quadrino's total loss amount of $122,000, rendering a total loss attributable to Quadrino in the amount of $72,000.

### c. Revised Loss Calculation

After accounting for the discounts which the government has agreed to in its submission for the Geismar and Pattinger transactions, and the loss adjustments with regard to John Maloney and Steven Quadrino, the final calculation results in a loss amount of $2,305,306 — well below the $2.5 million threshold.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 7

| | Govt's revised table calculation | Loss Amount with Corrected Maloney and Quadrino Valuation |
|---|---|---|
| **Betesh** | $240,000.00 | $240,000.00 |
| **Hoffman** | $67,500.00 | $67,500.00 |
| **Serure** | $79,000.00 | $79,000.00 |
| **Diamond** | $40,000.00 | $40,000.00 |
| **Waldner** | $15,000.00 | $15,000.00 |
| **Berger** | $19,000.00 | $19,000.00 |
| **Balter** | $4,000.00 | $4,000.00 |
| **Singer** | $7,000.00 | $7,000.00 |
| **Edrich** | $24,000.00 | $24,000.00 |
| **Lichtschein** | $28,000.00 | $28,000.00 |
| **Diversion from fund** | $978,356.00 | $978,356.00 |
| **SUB-TOTAL** | **$1,623,856.00** | **$1,501,856.00** |
| | | |
| **Saltzman/Tell** | $20,000.00 | $20,000.00 |
| **Fitzsimmons** | $60,000.00 | $60,000.00 |
| **Scharf** | $70,000.00 | $70,000.00 |
| **SUB-TOTAL** | **$150,000.00** | **$150,000.00** |
| | | |
| **Quadrino** | $122,000.00 | $72,000.00 |
| **Geismar** | $61,000.00 | $61,000.00 |
| **Pattinger** | $56,000.00 | $56,000.00 |
| **Maloney** | $667,950.00 | $464,450.00 |
| **SUB-TOTAL** | **$784,950.00** | **$653,450.00** |
| | | |
| **TOTAL** | **$2,558,806.00** | **$2,305,306.00** |

    We do not concede that this liberal analysis is appropriate, but since it results in a loss amount which is less than $2.5 million, there is no need to belabor the point.[6]  We respectfully submit that the aforementioned analysis compels a finding by this Court that the loss attributable to Mr. Fazio of $2,305,306.00 is well below the $2.5 million threshold, thereby lowering his offense level by two points. We also join in all arguments made by co-counsel with respect to loss, restitution, and forfeiture.

---

[6] We believe it bears noting not only that the government's revised calculation, which again completely misrepresents the testimony, renders only a $58,806 difference between level 16 and level 18, but that had the loss amounted to $7,000,000.00 Mr. Fazio would be facing the exact same guidelines as the government would have Mr. Fazio face under its analysis that the total loss is $2,558,806.00.

FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 8

### III.   BODILY HARM

Despite objecting to most of the issues raised in the government's response, we do agree with the government's statement of the law, located at page 22, footnote 3 of their submission, which states that "[f]actual statements made to the Court by a party, including by its counsel, are binding judicial admissions that are conclusive as to the facts asserted." Gov't Resp. 22, n. 3. In this regard, it bears emphasis that, during his rebuttal argument, Assistant United States Attorney Peter Skinner, stated:

> None of [the employers] say they went to the union hall to make the payments, they all somehow decide, when they are creating this story, it would be more believable that they would choose to do it in their own offices. **None of them says that they were roughed up in any way. That would make for a more interesting story, wouldn't it. Not one comes in and talks about some kind of physical violence and shaking around. No.**

Tr. 2586 *(emphasis supplied)*.

Rather, the government recounted the testimony as:

> They all say they feared what would happen if they didn't make the payments. They all said they feared **harm to their business.**

Tr. 2586 *(emphasis supplied)*.

Factual statements regarding threats of violence, or lack thereof, certainly come within the purview of what should be considered "binding judicial admissions that are conclusive." Gov't Resp. 22, n. 3. Clearly, the government did not believe the representations regarding threats of violence contained in the memorandum on which they now rely and ask the Court to consider at sentencing, because otherwise Mr. Skinner would not have made this representation during his rebuttal summation that this case contained no violence and that the employers testified that the harm they feared was to their businesses. It bears emphasis that those representations in the government's rebuttal came after hearing all of the defendants' closing arguments and the testimony at trial.

The government also includes a statement from Edwin Lynch that purports to recount a conversation Mr. Lynch had with Mr. Fazio in which Mr. Fazio threatened physical violence. The government chose not to call Mr. Lynch as a witness at the trial,



FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 9

presumably because he was unworthy of belief, yet it now urges the Court — in a 180 degree turnaround — to place stock in his statements, notwithstanding the fact that Fazio never had the opportunity to confront Lynch concerning this allegation. We deny these allegations and submit that the Court should not place any credence on them. Indeed, defense counsel and the defendant have never before seen these statements and they were not disclosed prior to the government's response on September 6, 2012. Should the Court choose to rely on this allegation in fashioning a sentence for Mr. Fazio, we reserve our right to demand a *Fatico* hearing to challenge it.

## IV.   CRIMINAL HISTORY CATEGORY

The government attempts to distinguish Mr. Fazio's two prior convictions, which are classified under New York Penal Code as "Gambling Offenses," from offenses which are "similar" to "gambling" under U.S.S.G §4A1.2(c)(1) by stating that there is a substantive conceptual difference between a gambler and a bookmaker. To support such a distinction, the government cites a Fifth Circuit case. However, the Second Circuit has never ruled on this issue, the Sentencing Guidelines do not draw such a distinction, and we respectfully submit that bookmaking is similar to gambling and therefore no criminal history points should be assigned.

## V.   FINANCES

The government makes much about Mr. Fazio's failure to provide his financials but fails to account for the facts, which remove any hint of "playing coy with the Court about his finances" or being "less than forthcoming with probation about his financial resources." Gov't Resp. 23.

First, Mr. Fazio has been detained since his conviction and therefore is not in a position to control the delivery of his financial information to the Probation Department. Second, our office provided the financial forms to his accountants but unfortunately they have failed to provide us or the Probation Department with the completed materials. However, having received the addendum to the Probation Report on September 6, 2012, only hours before we received the government's response, we now know that the Probation Department was never in receipt of those materials and have filed a financial affidavit concerning Mr. Fazio's finances under separate cover.



FISCHETTI
& MALGIERI LLP
Attorneys at Law

Honorable Katherine B. Forrest
September 11, 2012
Page 10

In sum, no fault shall be attributed to Mr. Fazio, because turning his financial information over to the Probation Department was beyond his control. Well aware that he made financial representations in the bail pending sentencing, no one should harbor the belief that his finances are being hidden.

## VI.     MEDICAL CONDITION

The government states that Mr. Fazio's statements to the Bureau of Prisons regarding his physical health reveals that he is dishonest. The government unfortunately overlooks the fact that Mr. Fazio, knowing full well that the Bureau of Prisons is incompetent in providing medical care, has understandably opted not to disclose the extent of his suffering in prison for fear that were he to be operated on by the medical staff at the BOP, he may very well end up in a worse medical condition than he is now. As such, we respectfully submit that Mr. Fazio's desire not to be operated on by the medical staff of the Bureau of Prisons should not be considered in any way as a failure to be honest with the Court.

## CONCLUSION

For all the foregoing reasons, we respectfully submit that the appropriate guidelines calculation in this case is 78 to 97 months and request that the Court exercise its discretion to impose upon Mr. Fazio a sentence at the bottom of the guidelines.

Respectfully submitted,

Ronald P. Fischetti